UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
TACOMA DIVISION

RICHARD CARL WOOD,

    Plaintiff,

v.

NANCY A. BERRYHILL,

    Defendant.

CASE NO. 3:17-cv-5430-RJB-BAT

**REPORT AND RECOMMENDATION**

Richard Carl Wood seeks review of denial of his Supplemental Security Income ("SSI") application based on new evidence demonstrating that the Administrative Law Judge ("ALJ") failed to meet his burden at Step 5 of the five-step disability evaluation process. He further contends that the ALJ improperly rejected the opinions of examining mental health professionals Dr. Khaleeq and Dr. Quinci. Dkt. 11. Mr. Wood argues that based upon these errors, the Court should remand the case for an award of benefits. The Court agrees the ALJ harmfully erred but disagrees that benefits should be awarded at this juncture. For the following reasons, the Court recommends **REVERSING** the Commissioner's final decision and **REMANDING** the case for further administrative proceedings under sentence four of 42 U.S.C. § 405(g).

**BACKGROUND**

Mr. Wood protectively filed a Title II application for a period of disability and disability insurance benefits, and a Title XVI claim for supplemental security income on April 17, 2012,

REPORT AND RECOMMENDATION - 1

alleging disability beginning October 3, 2003. Tr. 97, 111. These claims were denied initially and upon reconsideration. Tr. 95-150. Mr. Wood appeared and testified at a hearing held on April 29, 2014. Tr. 62-95. On April 29, 2014, ALJ Rolph issued a partially favorable decision, finding the claimant disabled as of April 28, 2012. Tr. 151-81. Mr. Wood appealed the ALJ's decision to the Appeals Council. Tr. 508-10. The Appeals Council remanded the ALJ's decision. Tr. 182-85. On August 18, 2016, Mr. Wood appeared at a hearing before ALJ Murgo. Tr. 45-61. On September 9, 2016, the ALJ issued an Unfavorable Decision, finding Mr. Wood was not under a disability from October 3, 2003 through April 28, 2012. Tr. 13-44. Mr. Wood appealed the ALJ's decision to the Appeals Council. Tr. 554-61. On March 31, 2017, the Appeals Council denied Mr. Wood's request for review. Tr. 1. This appeal follows.

Utilizing the five-step disability evaluation process,[1] the ALJ found Mr. Wood suffers from severe impairments, each of which more than minimally affects his ability to perform basic work activities, including back and neck problems with pain/radiculopathy; bilateral ankle problems/degenerative joint disease with residual pain; bilateral foot problems with pain; bilateral arm/shoulder problems with pain; obesity; mild carpal tunnel syndrome (CTS); diabetes Mellitus Type II; depression/major depressive disorder; anxiety/generalized anxiety disorder; pain disorder; personality disorder, Cluster C traits; and post-traumatic stress disorder (PTSD). Tr. 19.

The ALJ concluded that Mr. Wood has the residual functional capacity (RFC) to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a), with physical and mental limitations. Tr. 22. The ALJ further found that Mr. Wood is "fully capable of learning, remembering and performing simple and detailed work tasks up to and including SVP-4 level."

---

[1] 20 C.F.R. §§ 404.1520, 416.920.

REPORT AND RECOMMENDATION - 2

*Id.* Given limitations of less than sedentary exertion capacity, the ALJ found Mr. Wood was unable to perform his past relevant work. Tr. 34. Relying on the testimony of Vocational Expert (VE) Nancy Bloom, the ALJ concluded that Mr. Wood was able to perform the work of only two jobs: (1) document preparer (estimated at 61,646 jobs nationally) and (2) nut sorter (estimated at 10,214 jobs nationally). Tr. 35. Evidence submitted by Mr. Wood to the Appeals Council from independent VE Amberly Ruck (Tr. 556-561), directly challenges the validity of Ms. Bloom's conclusions.

## DISCUSSION

### A. New Evidence Presented to the Appeals Council – Step 5 Analysis

Mr. Wood contends that evidence presented to the Appeals Council demonstrates inherent inaccuracies in Ms. Bloom's testimony and that in fact, neither of the identified jobs exists in significant numbers in the national economy. Dkt. 11 at 3-7 (citing Affidavits of VE Ruck at Tr. 556-558 (re: nut sorter position) and 559-561 (re: document preparer position)). Courts consider the entire administrative record, including any evidence considered by the Appeals Council, "in determining whether the Commissioner's decision is supported by substantial evidence." *Brewes v. Commissioner of Social Sec. Admin*, 682 F.3d 1157, 1162-63. When considering the record as a whole, including the additional evidence, the undersigned concludes the ALJ's step five finding is not supported by substantial evidence.

The ALJ's disability determination expressly relied on the testimony of VE Bloom, who testified that an individual of Mr. Wood's age, educational background, past work experience and residual functional capacity could be a document preparer or nut sorter. Relying on this testimony, the ALJ concluded that Mr. Wood could perform work that existed in significant numbers in the national economy and therefore he was not disabled. The additional evidence

REPORT AND RECOMMENDATION - 3

submitted by Mr. Wood to the Appeals Council was directly responsive to the vocational expert's testimony and clearly undermines the ALJ's determination that jobs which Mr. Wood can perform exist in significant numbers in the national economy.

At step 5 of the sequential evaluation process (20 CFR 404.1520(g) and 416.920(g)), the ALJ must determine whether the claimant is able to do any other work considering his RFC, age, education, and work experience. If the claimant is able to do other work, he is not disabled. To meet this burden, the Commissioner may elicit testimony from an impartial VE, based on a hypothetical that includes all of the claimant's limitations that are supported by substantial evidence in the record. *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 886 (9th Cir. 2005).

At least in the absence of any contrary evidence, a VE's testimony is one type of job information that is regarded as inherently reliable and there is no need for an ALJ to assess its reliability. However, VE testimony is not unassailable. *See e.g., Buck v. Berryhill,* 869 F.3d 1040, 1051–52 (9th Cir. 2017) (ALJ must determine if VE's testimony is reasonable when it conflicts with the Dictionary of Occupational Titles (DOT) or Medical-Vocational Guidelines) (internal citations omitted)). Ms. Ruck's affidavits show that Ms. Bloom's method of calculation is flawed and that the positions of document preparer and nut sorter do not exist in significant numbers in the national economy. The Court examines the nut sorter calculations first as it is here that Ms. Bloom testified as to her methodology:

**1.     Nut Sorter**

Ms. Bloom testified that she took the following steps to determine there are 10,214 full-time nut sorter jobs:

> First, I locate the DOT number and then I go to the publication, the classification of [INAUDIBLE] manual. And I look up the census code using the SOC code. And with the census code, I go to the census code listings and determine how many unskilled, sedentary occupations are in that specific census group. And then

REPORT AND RECOMMENDATION - 4

> I look up the census code in the Occupational Employment Quarterly to determine the total of sedentary, unskilled jobs there are, divide that number by the number of sedentary, unskilled occupations in the census code.

Tr. 58-59. When she was asked how many other occupations are in the census code under the relevant SOC number, she could not state the number. Tr. 58. When counsel requested a post hearing interrogatory to flesh out the number, the ALJ denied the request and told counsel to do the research herself. *Id.* In answer to the ALJ's query as to whether a nut sorting job is seasonal, Ms. Bloom said that in her experience, it's "generally year round." Tr. 57. After the hearing, counsel objected to the VE's testimony (Tr. 525-53), did her own research, and submitted the affidavit of VE Amberly M. Ruck, to the Appeals Council. Tr. 556-558.

Counsel's research (using O*Net and the U.S Bureau of Labor Statistics), revealed that Ms. Bloom's calculation is not accurate because she failed to fully account for the number of occupational DOT codes located within the SOC group that includes the nut sorter position. The nut sorter position is located within the SOC group of "Inspectors Testers, Sorters, Samplers, and Weighers," which contains over 508,509 positions, and over 600 occupational DOT codes are included in the SOC Group. Tr. 552-53; Tr. 539-49. Thus, Ms. Bloom's calculation taking the total number of jobs under the SOC group and dividing it by the number of occupational DOT codes, would mean that each of the 600 jobs under the SOC group of "Inspectors Testers, Sorters, Samplers, and Weighers" has the exact same number of positions in the national economy. There is no evidence to support such a conclusion. In addition, 508,509 divided by 600 equals 847.515, not the 10,214 positions posited by Ms. Bloom.

Ms. Ruck's research also shows that Ms. Bloom's calculation does not accurately reflect the number of nut sorter jobs existing in the national economy. To arrive at her numbers, Ms. Ruck utilized SkillTran Job Browser Pro, which relies on the DOT and US Department of Labor

REPORT AND RECOMMENDATION - 5

amendments, and is the commonly accepted software used by rehabilitation and vocational experts. Tr. 556. Ms. Ruck explained that the nut sorter position falls into an Occupational Employment Census (OES) group of inspectors, testers, sorters, samplers, and weighers, and that group contains 782 different specialty occupations, each with their own DOT code. Tr. 557. These positions range from sedentary to heavy (from SVP 2 to SVP 7) and range in other physical and environmental demands so that the employment numbers of the 781 other positions cannot be included in an accurate VE testimony of the employment numbers for the nut sorter position. *Id*. Ms. Ruck's calculations establish that only 274 nut sorter jobs exist in the national economy, including part-time and self-employed positions. Tr. 557-58. Ms. Ruck's research also confirms that nut sorter jobs are classified as agricultural, which means they tend to be seasonal positions. Tr. 558.

### 2. Document Preparer

Ms. Bloom testified that there are 61,646 document preparer (DOT Code 219.587-018) (sedentary unskilled SVP 2) jobs existing in the national economy. Tr. 53. The DOT describes a document preparer as one who "prepares documents, such as brochures, pamphlets, and catalogs, for microfilming, using paper cutter, photocopying machine, rubber stamps, and other work devices [...]." DOT. This job description was last updated in 1986. *Id*.

In contrast, Ms. Ruck's research demonstrates that document preparer jobs do not exist in significant numbers in today's economy and certainly do not exist in the numbers posited by Ms. Bloom. Tr. 559-61. Ms. Ruck researched the document preparer job in Job Browser Pro, which relies on information from the DOT and Department of Labor. Tr. 559. She found that document preparer falls into an OES group containing 72 unique DOT codes. *Id*. These 72 unique jobs range from sedentary to very heavy in strength, and range from SVP 2 to SVP 7 in

skill level. They also range in other physical and environmental demands so that the employment numbers of the 71 other Office Clerk positions cannot be included in an accurate VE testimony of the employment numbers for the document preparer position. Tr. 560.

The results of Ms. Ruck's Job Browser Pro research reflects that there are 20,164 document preparer positions in the national economy. Tr. 560 (screenshot of Job Browser Pro utilizing keyword "document preparer.") Of the positions identified, 29.7% are part-time. *Id.* Therefore, roughly 14,175 full-time document preparer jobs exist in the national economy.

Ms. Bloom also testified that the document preparer job is an unskilled position. But Ms. Ruck's research demonstrates that document preparer is in fact skilled work. Tr. 561 ("any document preparing and microfilming to be performed would be performed in a position that [...] would require SVP 3 or above.")

Thus, there are significant discrepancies between the evidence reviewed by the ALJ at the hearing and the evidence submitted to the Appeals Council – (10,214 vs. 274 nut sorter jobs) and (61,646 vs. 14,175 document preparer jobs). The Commissioner argues, however, that the ALJ did not err in relying on Ms. Bloom's numbers for several reasons. The Court rejects these arguments as unavailing.

First, the Commissioner argues that based on Ms. Bloom's education, her calculations must be accurate. Dkt. 12 at 5-6. As shown above, however, significantly contrary calculations from a VE with credentials rivaling those of Ms. Bloom undermine the accuracy of her calculations.[2] The Commissioner also argues that Ms. Bloom's numbers should be trusted

---

[2] The credentials of Ms. Bloom and Ms. Ruck are not in dispute. Ms. Bloom has a Bachelor of Science and two Masters degrees. Tr. 516. Ms. Ruck has a Master's Degree in Rehabilitation Counseling (vocational rehabilitation), over 10 years of experience as a private VE rehabilitation consultant, two years spent working as a contracted SSA VE, and a Ph.D. in Business Administration. Tr. 556.

REPORT AND RECOMMENDATION - 7

because she performed labor/market surveys. The record reflects however, that the labor market research was done with regard to potential physical and mental limitations of the nut sorter job (i.e., sitting, standing, vision, environmental conditions) and not with regard to the amount of nut sorter jobs. Tr. 54-55. The Commissioner also argues that even if the jobs were reduced to account for Ms. Bloom's improper calculations, the number would still be significant as required by the Social Security Act. This is incorrect.

Significant jobs in the "national economy" must exist either "in the region where such individual lives or in several regions in the country." 42 U.S.C. § 423(d)(2)(A). There is no bright-line rule for determining how many jobs are "significant" under step five in the Ninth Circuit, although "a comparison to other cases is instructive." *Beltran v. Astrue*, 700 F.3d 386, 389 (9th Cir.2012). Moreover, there must be more than a few "scattered", "isolated" or "very rare" jobs available. *Walker v. Mathews*, 546 F.2d 814, 820 (9th Cir.1976); *see also Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 529 (9th Cir.2014). A national job figure cannot stand alone and must be considered in light of the fact that it represents jobs in several regions. *Beltran*, 700 F.3d at 390.

The Ninth Circuit recently noted that it has never found 12,600 jobs to constitute a significant number and the lowest number of nationwide jobs identified as significant was 25,000. *Lemauga v. Berryhill*, 686 Fed.Appx. 420, 422 (9th Cir. 2017) (citing *Gutierrez*, 740 F.3d at 528-29). In *Gutierrez*, the Ninth Circuit found 25,000 nationwide jobs to be significant, but characterized that as a "close call." *Id.* at 529. Therefore, 274 nationwide nut picking jobs and 14,175 nationwide document preparer jobs are not significant numbers.

Even if we assume Ms. Bloom's figures are correct, 10,214 nationwide nut picking jobs is not a significant amount of jobs. Although 61,646 nationwide document preparer jobs could

REPORT AND RECOMMENDATION - 8

be considered significant work, the new evidence reflects that Ms. Bloom's calculations did not account for the ranges of physical and mental skills level of all the jobs found under the document preparer classification. Tr. 561. In response, the Commissioner argues that the DOT "creates a rebuttable presumption as to the job classification." *Tommasetti v. Astrue*, 533 F.3d 1035, 1042 (9th Cir. 2008). Ms. Ruck's affidavit explicitly rebuts that presumption.

Based on the foregoing, the undersigned concludes that Ms. Ruck's testimony directly undermines the factual predicates upon which the ALJ relied in concluding that significant work for one with Mr. Wood's limitations exists in the national economy. Because the ALJ did not have the benefit of this new evidence in making his step 5 findings, the undersigned concludes that the appropriate remedy is to remand this case so that the ALJ can determine if, in fact, there are jobs that Mr. Wood can do which exist in significant number in the national economy. As explained below, the undersigned also concludes that the ALJ erred in his assessment of Mr. Wood's RFC.

**B.     Medical Evidence – Examining Mental Health Providers**

Mr. Wood contends the ALJ improperly rejected the opinions of Dr. Khaleeq and Dr. Quinci, who are the only examining mental health providers. The ALJ is charged with evaluating the medical evidence, *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995), and is not required to accept the opinion of a doctor. However, an ALJ may reject an examining physician's opinion only if the ALJ makes "findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1042 (9th Cir. 2007) (quoting *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007)). An ALJ does this by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation of the facts and evidence, and making findings. *Magallanes v. Bowen*,

REPORT AND RECOMMENDATION - 9

881 F.2d 747, 751 (9th Cir. 1989). The ALJ must do more than offer his conclusions; he must also explain why his interpretation, rather than the treating doctor's interpretation, is correct. *Orn*, 495 F.3d at 632.

### 1. Dr. Khaleeq

Dr. Khaleeq examined Mr. Wood on June 21, 2012. Tr. 875. Dr. Khaleeq reviewed Mr. Wood's function report and performed a clinical interview and mental status examination. Tr. 875-78. Dr. Khaleeq diagnosed Mr. Wood with major depressive disorder, recurrent, depression because of medical conditions, and PTSD. Tr. 877. Dr. Khaleeq stated that Mr. Wood's prognosis remained guarded because he continues to struggle with his chronic pain leading to depression, that he has psychosocial stressor of losing his mom at a young age on his birthday, has no other family support, remains withdrawn, and stays reclusive to self. *Id.* Dr. Khaleeq described Mr. Wood's functional assessment as follows:

> He could perform simple tasks and get distracted with complex tasking as he scored 1/3 after five minutes and says that he could not concentrate because of being in pain.
>
> He may have trouble interacting with public and coworkers as he stays mostly to self, does not like to come out in public, or interact with people, is deeply embarrassed to find light duty work and people telling him that there is no work for him.
>
> He may not be able to perform work activities on a consistent basis due to his poor energy level and being in pain.
>
> May not be able to do regular attendance in the workplace due to his poor sleep at night and struggling with depression and anxiety throughout the day.
>
> The usual stress encountered in the workplace would further aggravate his psychiatric condition.

Tr. 878. The ALJ did not give full weight to Dr. Khaleeq's opinion:

> Dr. Khaleeq's assessment of the limitations in the claimant's concentration and social interaction are given some weight, and have been considered and accounted

REPORT AND RECOMMENDATION - 10

> for to some degree in finding that the claimant is limited to simple and some detailed work tasks up to the SVP 4 level, as well as only occasional contact with the public. However, Dr. Khaleeq's opinion that the claimant may be unable to perform work consistently or maintain regular attendance is given little weight as it relies largely on the claimant's self report (e.g., doctor notes, "says that he could not concentrate" due to pain; "does not like to come out in public... deeply embarrassed to find light duty work;" not able to work consistently due to "poor energy level and being in pain") (id). Further, these limitations are not supported by the overall record, including the claimant's performance on mental status exams and his range of activities, discussed above (e.g., polite, cooperative, good eye contact; normal concentration and attention; attends college classes; goes to gym; plays golf with friends; "in charge of fundraising for Drug Awareness Coalition" for approximately 30 hours in a month) (Ex. B19F/90; B33F/1, 15, 17; B32F/10, 55, 56).

Tr. 33. Although the ALJ states that he had accounted "to some degree" for the limitations identified by Dr. Khaleeq in the RFC, the RFC states that Mr. Wood was "fully capable of learning, remembering and performing simple and detailed work tasks up to and including SVP level 4." Tr. 22. Therefore, the ALJ effectively rejected Dr. Khaleeq's limitation to simple tasks without providing specific and legitimate reasons. This error was not harmless as there "is an apparent conflict between the residual functional capacity to perform simple, repetitive tasks, and the demands of Level 3 Reasoning." *Zavalin v. Colvin*, 778 F.3d 842, 847 (9th Cir. 2015).

The ALJ also erred in rejecting Dr. Khaleeq's opinion that the claimant may be unable to perform work consistently or maintain regular attendance "as it relies largely on [Mr. Wood's] self-reports." Tr. 33. Dr. Khaleeq conducted a clinical interview and mental status evaluation. These are objective measures and the ALJ gave no specific and legitimate reasons for rejecting these findings. *See*, *e.g.*, *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017). As explained by the Ninth Circuit in *Buck*, "[p]sychiatric evaluations may appear subjective, especially compared to evaluation in other medical fields" and "[d]iagnoses will always depend in part on the patient's self-report, as well as on the clinician's observations of the patient." *Id.* Dr.

Khaleeq's partial reliance on Mr. Wood's self-reported symptoms is not a reason to reject his opinion.

In addition, the ALJ failed to explain which of Mr. Wood's accounts of his symptoms to Dr. Khaleeq had been properly discounted before the ALJ disregarded them. *See, Morgan v. Commissioner of Social Sec. Admin.*, 169 F.3d 595, 602 (9th Cir.1999) (internal citations omitted). The Commissioner argues that the ALJ made an "extensive and detailed adverse credibility finding" but this argument fails as the Commissioner merely makes general reference to seven pages of the ALJ's decision without further explanation or citation. Dkt. 12 at 2 (citing Tr. 23-30). Moreover, the Court must consider the ALJ's findings and rationale not the Commissioner's (*see Bray v. Comm'r,* 554 F.3d 1219, 1225-26 (9th Cir.2009) (court cannot rely upon reasoning the ALJ did not assert in affirming the ALJ's findings). Here, the ALJ erred when he failed to identify which of Mr. Wood's reports to Dr. Khaleeq at the examination were untruthful or misleading before he disregarded them.

The ALJ also erred in concluding that Mr. Wood's "performance on mental status exams and range of activities . . . (e.g., polite, cooperative, good eye contact; normal concentration and attention; attends college classes; goes to gym; plays golf with friends; in charge of fundraising for Drug Awareness Coalition for approximately 30 hours in month)" were inconsistent with Dr. Khaleeq's opinion that Mr. Wood is limited in his ability to perform work consistently or maintain regular attendance. Tr. 33. The ALJ failed to offer specific and legitimate reasons to conclude that going to the gym or school equates to maintaining regular attendance and consistent work performance.

It also appears that the ALJ improperly used isolated results of Mr. Wood's mental status evaluations rather than considering the overall diagnostic picture. *See*, *Ghanim v. Colvin*, 763

F.3d 1154, 1162 (9th Cir. 2014) ("Occasional symptom-free periods […] are not inconsistent with disability," and "[c]ycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working.") The ALJ refers to one treatment note that Mr. Wood had an unkempt appearance, poor insight, and low motivation (32F at 56 (Tr. 1393)) and another treatment note that Mr. Wood was casually groomed, had appropriate behavior and good concentration and judgment (33F at 17 (Tr. 1429), but provides no legitimate explanation of how these isolated treatment notes undermine Dr. Khaleeq's opinion.

The ALJ also rejected Dr. Khaleeq's opinion based on Mr. Wood's activities of daily living (volunteering, going to the gym, playing golf, and attending college classes). Claimants should not be penalized for attempting to lead normal lives in the face of their limitations. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). Neither does the Social Security Act require claimants to be "utterly incapacitated" in order to be eligible for benefits. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). "Many home activities are not easily transferable to . . . the more grueling environment of the workplace, where it might be impossible to periodically rest or take medication." *Id.* Only if the activities described by the ALJ are actually inconsistent with Mr. Wood's limitations do they have any bearing on his credibility. *Reddick*, 157 F.3d at 722.

Mr. Wood volunteered 30 hours in one month in 2009 (Tr. 1178), but there is no evidence that he continued these activities past that one month. He also joined a gym, but there is no evidence as to what he actually did at the gym, and whether he continued to go to the gym. A medical note indicates he did not find the gym helpful with pain management. Tr. 1392-93, 1346. Although Mr. Wood played golf, there is also evidence he was in severe pain after doing

so (Tr. 1345-46) and although he attended community college classes, he needed additional time to complete tasks, additional breaks, the ability to change positions, and the use of an ergonomic chair. Tr. 1164. The ALJ fails to describe how these activities are actually inconsistent with Dr. Khaleeq's stated limitations of Mr. Wood's ability to consistently maintain a regular work schedule.

In sum, the ALJ failed to provide specific and legitimate reasons for rejecting Dr. Khaleeq's opinion. The ALJ must do more than offer his own conclusions, but must set forth his own interpretations and explain why they, rather than the doctor's, are correct. *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir.1988). Here, the ALJ erred by failing to provide specific and legitimate reasons based on substantial evidence to conclude that his assessment is more correct than Dr. Khaleeq's.

### 2. Dr. Quinci

Dr. Quinci performed three psychiatric evaluations of Mr. Wood between May 2012 and April 2013. Tr. 1315-28. In May 2012, Dr. Quinci observed various symptoms but did not offer an opinion regarding Mr. Wood's mental functioning. Tr. 1315-18. In November 2012, Dr. Quinci performed a second psychiatric evaluation and determined that Mr. Wood suffered from marked limitations in his ability to (1) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances without special supervision; and (2) complete a normal work day and work week without interruptions from psychologically based symptoms. Tr. 1321. In April 2013, Dr. Quinci performed a third psychiatric evaluation and determined that Mr. Wood suffered from a severe limitation in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. Tr. 1326. Dr. Quinci also determined that Mr. Wood suffered from marked limitations in his ability to (1)

perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances without special supervision; (2) ask simple questions or request assistance; and (3) communicate and perform effectively in a work setting. *Id*.

The ALJ gave minimal weight to Dr. Quinci's opinions:

> While there is objective evidence that the claimant has mental health conditions and some resulting limitations, I find that these evaluations rely heavily on the claimant's self reported symptoms imitations. I further note that these evaluations were conducted for the purpose of determining the claimant's eligibility for state assistance; the claimant was likely aware that the continuation of his state assistance was dependent upon the DSHS evaluations, and he therefore had incentive to overstate his symptoms and complaints. Further, DSHS uses different state disability regulations and standards that are not controlling in this case. Moreover, such degrees of severity are inconsistent with the claimant's mental status exam as noted by Dr. Quinci, indicating generally within normal limits and no worse than mild-moderate impairment in any particular area. Dr. Quinci's opinion is also inconsistent with claimant's mental status evaluations with primary care providers and independent medical examiners, discussed above (e.g. "negative" psychiatric screenings; within normal for appearance, mood affect behavior, thought processes content; only mild difficulties in memory and concentration). In addition, the psychologist's opinion of marked limitations does not correlate with the claimant's range of activities (e.g., "in charge of fundraising for Drug Awareness Coalition for approximately 30 hours a month;" attending college business classes, going to gym and playing golf with friends).

Tr. 33 (citations omitted). As previously discussed with regard to Dr. Khaleeq's opinion, rejection of a psychologist's opinion because it is partially based on self-reporting is error. Here, Dr. Quinci performed three psychiatric examinations of Mr. Wood. The ALJ provides no specific or legitimate reason to conclude that those examinations "relied heavily" on self-reporting. Similarly, as discussed above with regard to Dr. Khaleeq's opinion, the ALJ's rejection of Dr. Quinci's opinions based on Mr. Wood's activities of daily living was error as the ALJ fails to describe how the activities (volunteering, going to the gym, playing golf, and attending college classes) are inconsistent with Dr. Quinci's opinion that Mr. Wood suffered from a severe limitation in his ability to complete a normal workday and workweek without

interruptions from psychologically based symptoms. *See* SSR 96-8p ([residual functional capacity] is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule).

The ALJ next erred when he speculated that Mr. Wood was probably faking symptoms in order to obtain state benefits. Tr. 33. There is nothing in the record to support such an accusation. Similarly, the ALJ failed to support his conclusory statement that "DSHS uses different disability regulations and standards that are not controlling in this case." Tr. 33. The ALJ was required to provide persuasive, specific, and valid reasons for not according a Washington State decision great weight. *See Berry v. Astrue*, 622 F.3d 1228, 1236 (9th Cir. 2010) (a decision of another agency is ordinarily entitled to great weight when that agency's disability program bears a "marked similarity" to the Social Security disability program); Wash. Admin. Code § 182-512-0050 (2014) (previously codified as Wash. Admin. Code § 388-475-0050) (providing for use of the five-step Social Security analytic framework.))

In positing that Dr. Quinci's mental status examination results did not stand for more than mild to moderate limitations, the ALJ improperly substituted his opinion for that of Dr. Quinci. This was error as the ALJ must set forth his own interpretations and explain why they, rather than the doctors', are correct. *Embrey,* 849 F.2d at 421-22 (9th Cir.1988). The ALJ also concluded that Dr. Quinci's limitations were inconsistent with other mental status examinations and other findings within normal limits (e.g., mood, affect, thought processes), but did not cite to any specific examination or explain why the "normal limits" findings undercut Dr. Quinci's stated limitations.

In sum, the undersigned concludes that the ALJ erred in giving minimal weight to the opinions of Dr. Khaleeq and Dr. Quinci. The ALJ improperly rejected Dr. Khaleeq's opinion that Mr. Wood was limited to simple tasks and may be unable to perform work consistently or maintain regular attendance. The ALJ also improperly rejected Dr. Quinci's opinion that Mr. Wood was limited in his ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances without special supervision, to ask simple questions or request assistance, and communicate and perform effectively in a work setting. These were not harmless errors as the limitations were not appropriately reflected in Mr. Wood's RFC.

The validity of the ALJ's RFC determination is predicated upon whether the ALJ properly assessed all the relevant evidence, including medical reports and witnesses' descriptions of limitation, to determine what capacity the claimant has for work. Similarly, hypothetical questions that an ALJ poses to a VE to determine what work a claimant can perform "must include 'all of the claimant's functional limitations, both physical and mental' supported by the record." *Thomas v. Barnhart*, 278 F.3d 947, 956 (9th Cir.2002) (quoting *Flores v. Shalala*, 49 F.3d 562, 570–71 (9th Cir.1995)). Here, the ALJ erred when he failed to mention or discuss all limitations found by Mr. Wood's examining mental health providers and failed to include all limitations in questioning the VE.

**C.      Scope of Remand**

Mr. Wood argues the Court should reverse and remand the Commissioner's final decision for an award of benefits. Where the ALJ has committed reversible error, the Court has the discretion to remand for further proceedings or to award benefits. *See Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990). Only in rare circumstances should a case be remanded for

benefits. *See Treichler v. Colvin*, 775 F3d 1090, 1099 (9th Cir. 2014). The Court may remand for an award of benefits where "the record has been fully developed and further administrative proceedings would serve no useful purpose." *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002) (citing *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996)). If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded for further proceedings. *McCartey*, 298 F.3d at 1076.

Here, additional proceedings are required to allow the ALJ to properly assess all limitations found by Mr. Wood's examining mental health providers in determining Mr. Wood's RFC and then to assess, in light of the new evidence presented to the Appeals Council, whether there are, in fact, jobs in significant numbers in the national economy that Mr. Wood can do given his physical and mental limitations. The case should therefore be remanded for further administrative proceedings.

**CONCLUSION**

For the reasons above, the Court recommends the Commissioner's final decision be **REVERSED** and the case be **REMANDED** for further administrative proceedings under sentence four of 42 U.S.C. § 405(g).

On remand, the ALJ shall reassess the opinions of Dr. Khaleeq and Dr. Quinci, consider the additional evidence submitted to the Appeals Council, reassess Mr. Wood's residual functional capacity, and determine whether there are jobs which Mr. Wood can perform that exist in significant numbers in the national economy.

A proposed order accompanies this Report and Recommendation. Any objection to this Report and Recommendation must be filed and served no later than **December 8, 2017**. If no objections are filed, the Clerk shall note the matter for **December 12, 2017,** as ready for the

Court's consideration. If objections are filed, any response is due within 14 days after being served with the objections. A party filing an objection must note the matter for the Court's consideration 14 days from the date the objection is filed and served. Objections and responses shall not exceed ten pages. The failure to timely object may affect the right to appeal.

DATED this 17th day of November, 2017.

_____
BRIAN A. TSUCHIDA
United States Magistrate Judge

REPORT AND RECOMMENDATION - 19